# UNITED STATES DISTRICT COURT

## FOR THE EASTERN DISTRICT OF MICHIGAN

_____

JULIE CHRISTINE LAEL BAUMER,

             Plaintiff,                            Case No.

                                                  HON.

vs

SUSAN DAVIS,
Warden of Huron Valley Complex- Women,
a Michigan Department of Corrections Facility.

             Defendant.

_____

CARL MARLINGA (P17102)
43550 Elizabeth Rd.
Clinton Township, MI 48036
(586) 468-1783
Counsel for Julie Baumer

CHARLES I. LUGOSI (P70549)
Ave Maria School of Law
3475 Plymouth Road
Ann Arbor, MI 48105
(734) 827-8031
Co-Counsel for Julie Baumer


_____

## APPLICATION FOR WRIT OF HABEAS CORPUS

**INTRODUCTION**

Julie Baumer requests relief from judgment under 28 USC §2254 on constitutional grounds, including actual innocence and ineffective assistance of counsel.  In 2005, Ms. Baumer was convicted of abusing her six-week old nephew, Philipp Baumer, based solely on medical testimony.  The medical records have recently been reviewed by Dr. James A. J. (Rex) Ferris, Professor Emeritus of Forensic Pathology at the University of British Columbia, and Dr. Michael Krasnokutsky, co-author of a major radiological article on pediatric head injury with Professor Patrick Barnes of Stanford University Medical School.[1]  Dr. Ferris' affidavit is attached as Exhibit 1.  Dr. Krasnokutsky's affidavit and PowerPoint slides are attached as Exhibit 2.

Dr. Ferris' and Dr. Krasnokutsky's  reviews confirm that Philipp's brain damage was the result of venous sinus thrombosis ("VST"), a frequently misdiagnosed form of childhood stroke. VST is most commonly found in infants under the age of three months and is often triggered by sepsis (infection that has entered the bloodstream) and dehydration, both of which were diagnosed at Mount Clemens General Hospital.  An earlier skull fracture is most likely a birth injury.  This diagnosis explains the child's radiological findings, clinical history and subsequent diagnosis of cerebral palsy.  It also resolves the inconsistencies in the testimony of the State's witnesses, as well as the inconsistencies between the caretaker observations and the pediatrician's reports.

---

[1] Barnes, P., M.D., & Krasnokutsky, M., M.D., *Imaging of the Central Nervous System in Suspected or Alleged Nonaccidental Injury, Including the Mimics*, 18 TOP MAGN RESON IMAGING 53 (2007) (Att. A to Exhibit 2).  Dr. Barnes is a Professor of Radiology at the Stanford University Medical Center and Chief of Pediatric Neuroradiology at Lucile Salter Packard Children's Center.

## I.  PROCEDURAL HISTORY

1.    Julie Baumer was convicted of child abuse in the first degree under MCL 750.136b(2) by a
      jury in the Macomb County Circuit Court on September 29, 2005.  The Honorable James
      M. Biernat presided at trial.  Ms. Baumer was sentenced by Judge Biernat to 10–15 years
      imprisonment on November 9, 2005.  She is serving that sentence at the Huron Valley
      Complex-Women in Ypsilanti, Michigan, located in the eastern District of Michigan.

Ms. Baumer sought reversal of her conviction in the Michigan Court of Appeals on December
28, 2005.  The Court of Appeals denied relief on April 12, 2007 in an unpublished per curiam
opinion.  *People v Julie Christine Lael Baumer* (No. 267373).[2]  The Michigan Supreme Court
denied leave to appeal on September 10, 2007.  *People v Julie Christine Lael Baumer* (No.
133892).

2.

      At trial, Ms. Baumer was represented by Elias Muawad, who continued to defend Ms.
      Baumer's innocence at sentencing.[3]  It is our understanding that Mr. Muawad will be
      supporting this Motion.  Ms. Baumer was represented by Madelaine P. Lyda on appeal to
      the Court of Appeals.  Ms. Baumer represented herself on appeal to the Supreme Court.

---

[2] The opinion of the Court of Appeals is attached as Exhibit 6.
[3] TR IX, 9. References to the transcript are in the form of volume, page.  The transcript of the September 20
proceedings is not labeled with a volume number but is referenced as volume I.  The transcript of the June 2
evidentiary hearing is referenced as TR Ev Hrg I, and the transcript of the June 14 evidentiary hearing is referenced
as TR Ev Hrg II.

## II.  STATEMENT OF FACTS

<u>Medical History</u>

3.   Since there were no witnesses to the alleged abuse, the State's case rested on the interpretation of CT scans and an MRI by two State witnesses.  If these interpretations were incorrect, there is no basis for the conviction.  In this Motion, we briefly review the medical evidence presented at trial as well as the new evidence provided by Drs. Ferris and Krasnokutsky.

Philipp Baumer is Julie Baumer's nephew.  Due to Philipp's mother's addiction to crack cocaine, Julie agreed to adopt Philipp and was his primary caretaker.[4]

4.

On October 3, 2003, Julie brought Philipp to Mount Clemens General Hospital ("Mt. Clemens") at approximately 1 p.m. for vomiting and lethargy.  Philipp was six weeks old at the time.  A CT scan taken approximately 33 hours after hospital admission showed severe brain damage and a skull fracture of undetermined age.

5.   At trial, the State's experts contended that Julie caused the brain damage (and possibly the fracture) through an undetermined mechanism most likely occurring approximately 24 hours before the CT scan.  It went undeveloped at trial that Philipp was *in the hospital* 24 hours before the CT scan, indicating that the brain damage was natural, rather than traumatic, in origin.

The symptoms described in ¶¶ 8–10 include 5 of the 6 factors doctors use to diagnose neonatal brain damage.[5]

---

[4] TR I, 8.
[5] Exhibit 1, Att. C at 1989 (gavage feeding, poorly responsive, decreased muscle tone, absent reflex, suspected seizure).

4

6.   At a September 23 pediatric visit, Philipp's weight was recorded as 8 lbs 10 oz, with no problems noted.

At about 5 p.m. on October 3, Philipp was transferred to the Children's Hospital of Michigan ("Children's").  When he showed signs of acute brain swelling, Children's performed a CT scan of Philipp's head.  This scan was taken at 9:39 p.m. on October 4, approximately 33 hours after Philipp entered the Mt. Clemens emergency room.[6]

7.   This scan revealed extensive recent brain damage and a skull fracture of undetermined age. Radiologists opined that the pattern of damage was consistent with non-accidental injury and "shaken baby syndrome."

8.   Julie Baumer was charged and tried based solely on the radiological findings, combined with evidence that she was Philipp's caretaker from the evening of September 28 through the morning of October 3.

Trial

Counsel further failed to adequately investigate or develop the birth trauma defense.  His questions revealed that Philipp's skull fracture could possibly have been caused by a normal delivery,[7] but he offered no evidence to show that the brain damage, the lynchpin of the State's case, could have started with birth injury.  Thus, he failed to produce evidence that Philipp's mother had been given Pitocin; that Philipp suffered loss of oxygen during birth; or any evidence linking the symptoms suffered after birth to a congenital or non-abusive mechanism.  Instead, the State's experts vigorously denied those possibilities,[8] and his own expert testified that the fracture was likely part of the "spectrum of child abuse."[9]

---

[6] TR III, 68; Exhibit 4 at 27; Exhibit 2, Att. B.
[7] TR VI, 31.
[8] TR I, 47, 55, 60; TR III, 42; TR V, 115.
[9] TR VI, 83.

9.    Trial counsel also failed to point out that the State's witnesses testified that the brain damage most likely occurred in the hospital, suggesting that it was natural, not traumatic, in origin.  Stroking in the hospital would be consistent with the seizures observed by neonatal specialists at Mt. Clemens and the hospital staff at Children's.

10.   The defense that Philipp had been abused by someone other than Julie required the jury to disbelieve the State's interpretation of Philipp's CT and MRI scans.  Defense counsel was unprepared to cast doubt on the experts' timing or causation via cross examination because the defense had not retained its own expert to read the radiology reports and was unfamiliar with the literature.

An expert radiologist would have challenged the mechanisms of injury postulated by Drs. Ham and Becker.  Specifically, a recent review of the radiology has established that Philipp's brain damage was due to venous sinus thrombosis, or childhood stroke, which is rarely associated with trauma and is most commonly associated with sepsis and dehydration.[10]  An expert radiologist would have confirmed that the areas of stroke were unrelated in location and timing to the earlier skull fracture, which possibly related back to birth.  Further, a radiologist would have agreed with the State's witnesses that the size and consistency of the infarcts (dead brain cells) indicated that the stroke most likely occurred 24–72 hours prior to the CT scan.[11]  These findings would have led reasonable counsel to present a defense that incorporated all of the evidence, specifically, that Philipp suffered some birth injuries, likely including the fracture, followed by nonspecific symptoms, including the failure to feed (requiring a week-long hospitalization) and mini-seizures or mini-strokes (as reported to the pediatrician), culminating in a major stroke occurring either

---

[10] Exhibit 1 at ¶ 9 *et seq*.; Exhibit 2 at ¶ 6 *et seq*.
[11] Exhibit 2 at ¶¶ 18, 20.

shortly before or during hospitalization. Counsel would have discarded the theory that Philipp was abused while outside Julie's custody, a theory that had little credibility since counsel was unable to identify an abuser other than by general references to his birth mother's drug habit.[12]

11. Ms. Baumer did not testify in her own defense. It is our understanding that counsel inadequately informed her of her right to testify, such that she did not believe she could overrule counsel's strategic decision not to call her.

Appeal

Appellate counsel's claim of insufficiency of the evidence consisted almost exclusively of incorrect conclusory allegations that *no evidence* supported Ms. Baumer's conviction.[13] Appellate counsel's claim of ineffective assistance of counsel was limited to the failure to raise the defense of Pitocin-related birth defects.[14]

12. Appellate counsel did not address the trial court's exclusion of Dr. Ophoven's testimony on the current medical research and literature, or challenge the sufficiency of the evidence based on inconsistency among the State's experts or the fact that their timing placed Philipp's brain damage as most likely occurring at the hospital, where Julie was unable to harm him. Appellate counsel also did not address trial counsel's failure to retain an expert radiologist or thoroughly investigate alternative causations.

New Evidence

13. Dr. Michael Krasnokutsky, the co-author of a leading pediatric radiology review, has reviewed the crucial radiological evidence, and his findings have been reviewed and

---

[12] *See* Exhibit 9 at ¶ 20; Exhibit 10 at ¶ 56. As this suggests, in cases like this one, which present complicated fact patterns, evolving medical literature, and a number of specialties, it is typical for both sides to require more than one expert.
[13] Exhibit 7 at 20–24.
[14] Exhibit 7 at 35–40.

interpreted in light of Philipp's medical history by forensic pathologist Dr. James A. J. (Rex) Ferris. Dr. Krasnokutsky and Dr. Ferris have provided their reports on a *pro bono* basis. These reports, which are attached as Exhibits 1 and 2, should be read in their entirety.

The State's experts missed this diagnosis, most likely for three reasons. First, because VST is a relatively unusual diagnosis (annual incidence rate estimated at 1/100,000 births),[15] many pediatricians and pediatric radiologists have never encountered it in their practices and hence do not know to look for it. Second, neonatal brain injury and VST are often under-diagnosed because they have non-specific and clinically subtle signs and symptoms, and their causes are only now being revealed due to advances in diagnostic imaging and larger case studies.[16] Third, the State's experts admitted that they did not interpret the imaging in light of Philipp's medical history. The medical literature confirms that VST is often missed when physicians do not exercise a "high index of suspicion" and evaluate the patient's history in its totality.[17]

14. Although this is a classic case of VST, it is not possible to determine when Philipp first began to stroke. CT scans and MRIs were not taken in the neonatal ward on August 17–29, when he presented with lethargy and failure to suck; on August 29, when he presented with twitches and tremors; or for 32–33 hours after hospital admission on October 3. This evidence gap makes it impossible to determine when the stroking first began. Based on his symptoms and medical records, however, it is likely that Philipp had some brain damage and neurological problems from birth, likely related to prenatal conditions and birth trauma, followed by mini-seizures or mini-strokes (as evidenced by twitches, tremors, and rapid eye

---

[15] Exhibit 5, Wasay at 26.
[16] Exhibit 1, Att. C at 1985, 1989–90; Exhibit 5.
[17] Exhibit 1, Att. B at 422.

blinking), followed by catastrophic stroking occurring 24–72 hours before the first CT scan, triggered by illness and dehydration. The seizures observed by the neonatologist at Mt. Clemens and the hospital staff at Children's suggest that the major stroking may have occurred during hospitalization.

While some of this evidence was available at the time of trial in 2005, trial counsel's ineffective preparation and the erroneous exclusion of Dr. Ophoven's testimony kept much of it from the jury. Further, the research on VST and alternative explanations for symptoms previously attributed to "shaken baby syndrome" and non-accidental injury has continued to evolve since 2005. As a result, this evidence is richer and more credible now than it was three years ago. Recent studies that were not available in 2005 include the 2007 radiology review by Drs. Barnes and Krasnokutsky,[18] which contains five pages of alternative diagnoses, and numerous research articles on the diagnosis, symptoms, and predisposing factors of VST and other forms of childhood stroke.[19]

### III.   GROUNDS FOR RELIEF

15. Julie Baumer was denied the effective assistance of trial and appellate counsel, in violation of the Sixth and Fourteenth Amendments to the United States Constitution.

16. Julie Baumer was convicted on evidence insufficient to constitute proof beyond a reasonable doubt, in violation of the Fourteenth Amendment and *In re Winship*, 397 US 358 (1970).

---

[18] Barnes, P., M.D., & Krasnokutsky, M., M.D., *Imaging of the Central Nervous System in Suspected or Alleged Nonaccidental Injury, Including the Mimics*, 18 TOP MAGN RESON IMAGING 53 (2007) (Att. A to Exhibit 2).
[19] *See, e.g.*, Wasay, M., M.D., F.R.C.Path., et al., *Cerebral Venous Sinus Thrombosis in Children: a Multicenter Cohort from the United States,* 23 J CHILD NEUROL 26 (2008); Fitzgerald, K., M.Sc., et al., *Cerebral Sinovenous Thrombosis in the Neonate,* 63 ARCH NEUROL 405 (2006); Sébire, G., et al., *Cerebral Venous Sinus Thrombosis in Children: Risk Factors, Presentation, Diagnosis and Outcome,* 128 BRAIN 477 (2005) (all attached in Exhibit 5). Similar advances have occurred in pediatric head injury in general, including "shaken baby syndrome."

17. Newly discovered evidence and evidence not presented to the jury due to constitutional violations demonstrate that Julie Baumer is actually innocent under the standards set forth in *Schlup v Delo*, 513 US 298 (1995) and *Herrera v Collins*, 506 US 390 (1993).

## IV.   LEGAL ISSUES

18. Ineffective assistance of counsel.   Trial counsel's failure to consult with or present the testimony of an expert radiologist constitutes a deficient investigation of the facts and defenses under *Strickland v Washington*, 466 US 668 (1984) and *Rompilla v Beard*, 545 US 374 (2003).   A virtually identical fact pattern is found in *State v Hales,* 2007 UT 14; 152 P3d 321 (Utah, 2007).   In *Hales*, the defendant was accused of killing his girlfriend's young son by shaking.   Although it became apparent at a preliminary hearing that the State had no witnesses to the alleged abuse and that CT scans would be critical to the State's case, trial counsel consulted only a forensic pathologist.   The forensic pathologist testified that the injuries could not have been caused by shaking but was unqualified to refute the State's interpretations of the radiology.   Since it was critical that the jury disbelieve the State's interpretation of the CT scans, the Utah Supreme Court found that a reasonable attorney would have consulted a qualified radiologist.   Based on an affidavit from Dr. Patrick Barnes, the Court held that, had this been done, there was a reasonable probability that the defense would have obtained, and the jury would have credited, crucial expert evidence on the timing, nature, and violence of the injury.   *Id.* at 339–40, 344.   The Court held that the failure to consult with a qualified radiologist constituted ineffective assistance of counsel and a deprivation of defendant's due process rights.   *Id.   See also People v Campbell*, 2005 Mich App LEXIS 186, unpublished opinion per curiam of the Court of Appeals, issued Jan.

27, 2005 (Docket No. 245263) (granting new trial where murder conviction rested solely on medical evidence and counsel failed to consult with medical experts).

19. That counsel may have unsuccessfully sought informal appointment of an expert radiologist due to Ms. Baumer's indigence is irrelevant. Even without a radiologist, counsel should have reviewed the radiology literature sufficiently to conduct an effective cross-examination of the State's witnesses. In addition, reasonable counsel would have: (1) filed a formal motion for appointment of an expert under MCL 775.15, with available interlocutory appeal; (2) subpoenaed the radiologists who actually performed Philipp's diagnostic imaging and elicited their expert opinions; or (3) withdrawn as counsel due to his client's indigence with a request that the defense be presented at state expense. *See Ex parte Briggs*, 187 SW2d 458 (Tex Crim App, 2005) (vacating conviction where counsel's failure to retain necessary expert was financial rather than strategic decision); *State v Schoonmaker*, 2008 NMSC 10; 176 P3d 1105 (NM, 2008) (same).

20. Counsel's ineffective performance prejudiced Ms. Baumer, since consultation with an expert radiologist would have yielded a diagnosis of venous sinus thrombosis, or childhood stroke. This diagnosis would almost certainly have resulted either in acquittal or in dismissal of the charges.

Right to testify. Counsel ineffectively apprised Ms. Baumer of her right to testify. The trial court determined that Ms. Baumer understood her constitutional right to testify and voluntarily waived it.[20] That decision, however, was tainted by counsel's ineffective explanation of the right. It is our understanding that counsel did not adequately inform Ms. Baumer that the decision whether to exercise her constitutional right was ultimately up to her, and failed to inform her that she could overrule his decision not to put her on the stand.

---

[20] TR VI, 131–33.

It is our understanding that Ms. Baumer repeatedly attempted to persuade counsel to allow her to testify, but gave up when arguing proved futile.

21. Counsel cannot overrule a defendant's desire to testify. *United States v Webber*, 208 F3d 545, 551 (CA 6, 2000), *citing Rock v Arkansas*, 483 US 44 (1987). Even when defendant knows her rights, the courts refuse to countenance counsel's failure to inform defendant that the ultimate decision whether to exercise those rights is defendant's alone. *Campos v United States*, 930 F Supp 787, 793 (EDNY, 1996) (granting habeas relief on grounds of ineffective assistance, where defendant knew he had the right to testify but trial counsel did not explain that the ultimate decision was defendant's).

Counsel prejudiced Ms. Baumer by not allowing her to tell her side of the story. At trial, counsel produced little evidence of Julie's good character, demeanor, and positive experience with children. The most emotional evidence was highly stacked in favor of the State, including inflammatory photographs depicting Philipp's current physical condition.[21] Although Julie has consistently denied making this statement, the jury also heard testimony that Julie had allegedly stated to police that she sometimes got so angry with Philipp that she had to leave the room, for fear of what she might do.[22] Ironically, while highly prejudicial in the trial context, this merely reflects the advice commonly given by pediatricians to frustrated parents of crying infants. Perhaps most important, the jury became aware that Julie had been administered a polygraph test, with the obvious implication that she had failed it.[23] In this climate, Julie's enforced silence is "sufficient to undermine confidence in the outcome" of her trial. *Strickland, supra* at 694; *People v Pickens*, 446 Mich 298, 303; 521 NW2d 797 (1994).

---

[21] TR I, 107.
[22] TR IV, 10.
[23] TR V, 39.

22. Exclusion of Dr. Ophoven's testimony. The preclusion under MRE 703 of Dr. Ophoven's attempt to refute the State's claims on timing and "shaken baby syndrome" based on non-admitted current research literature was error, since scientific literature need not be in evidence to form the basis for an expert opinion. *People v Yost*, 278 Mich App 341, 391; 749 NW2d 753 (2008) (per curiam) (granting new trial where pathologist was forbidden from testifying on cause of death because opinion was informed by medical text not in evidence).

Ms. Baumer raises this issue for the first time, but the procedural bar established by MCR 6.508(D)(3) is excused for two reasons. First, appellate counsel was ineffective for failing to raise the exclusion issue on direct appeal. Appellate counsel performs ineffectively when there is no excuse for counsel's failure to raise an obvious error that could result in reversal. *Gardner*, *supra* at *9 n11. The wrongful exclusion of testimony under MRE 703 on the grounds articulated by the trial court is so obvious an error that the Court of Appeals has considered it *sua sponte* and reversed for plain error. *Yost*, *supra* at 389 (remanding for new trial in per curiam opinion). It was not reasonable for appellate counsel to choose the speculative and substantially unsupported arguments briefed over one much more likely to result in reversal.[24] Second, the literature that Dr. Ophoven would almost certainly have discussed would have created "a significant possibility that defendant is innocent of the crime." MCR 6.508(D)(3).

23. Insufficiency of the evidence. The evidence against Ms. Baumer at trial was flimsy and incoherent. Since the State presented no witnesses to the alleged abuse, the State's case was based on circumstantial medical theories advanced by Drs. Ham and Becker.

---

[24] Appellate counsel's ineffective assistance constitutes an independent constitutional violation. *See, e.g.*, *Wright v West*, 505 US 277, 293 (1992) (right to counsel extends to first direct appeal).

However, those theories contradicted each other and, even if taken as correct, established only a slim chance that Ms. Baumer abused Philipp.  Specifically, Dr. Ham testified that Philipp was injured within 12–24 hours of 9:39 p.m. on October 4, and Dr. Becker testified that he was injured within 24–48 hours, but more likely within 24 hours, of that time. This timing places the brain damage as occurring *while Philipp was at Children's or Mt. Clemens*, not while he was in Julie's care, and is consistent with the seizures noted at both hospitals.  Drs. Ham and Becker also disagreed on the relationship between the fracture and the brain damage: Dr. Ham testified that the fracture and brain damage occurred at the same time, while Dr. Becker testified that they were separate events, occurring at different times, with different causations.  Drs. Ham and Becker also directly contradicted each other on causation: Dr. Ham testified that all brain and head injuries were caused by blunt force trauma, whereas Dr. Becker testified that the fracture was caused by impact or trauma (possibly due to the use of forceps during birth), but that the diffuse brain damage was inconsistent with a single impact and was best explained by repetitive shaking.  There was, however, no evidence of shaking, such as neck injury, broken ribs, or bruising on the chest or extremities.  Such confusing and contradictory evidence does not meet the standard of proof beyond a reasonable doubt, in violation of the Fourteenth Amendment and *In re Winship*, 397 US 358 (1970).

Actual innocence/new evidence.  A review of the CT scan and MRIs has established that Philipp's brain damage was caused by venous sinus thrombosis, or childhood stroke. Unlike the State's theories, which were contradicted by its own experts, this non-abusive diagnosis reconciles the conflicting evidence presented at trial.[25]  In particular, VST is associated with sepsis, dehydration, and other laboratory findings that went ignored at trial.

---

[25] *See generally* Exhibit 1.

14

VST also causes brain hemorrhage, swelling, and infarct, mimicking the presentation of abusive head trauma.  The radiological review establishes a definitive diagnosis of VST, as demonstrated on Dr. Krasnokutsky's PowerPoint.  This diagnosis is supported by the medical history admittedly ignored by the State's experts—including Philipp's initial hospitalization, his continuing lethargy and feeding difficulties, his failure to respond to common stimuli, and the twitching and blinking observed by his mother, aunt, grandparents and great-grandfather.[26]

24.   Had this diagnosis been explained at trial and the jury provided a comprehensive theory synthesizing the medical evidence, it is "more likely than not that no reasonable juror would have convicted."  *Schlup v Delo*, 513 US 298, 327 (1995).  Further, this new showing is a "truly persuasive demonstration" of actual innocence, which the Supreme Court has suggested may be sufficient to warrant relief even absent underlying constitutional error.  *Herrera v Collins*, 506 US 390, 417 (1993).

25.   Subsidiary claims.  Several subsidiary claims require further factual review.  First, reports of Philipp's alleged abuse by Ms. Baumer were widely disseminated in the Macomb Daily during the trial, potentially tainting the jury pool.  The first story, which we believe was headlined on the front page, quoted Philipp's adoptive parents and strongly implied guilt.[27] Second, it is likely that inaccurate statements made by the prosecutor during her closing argument misled the jury.  Although the crucial timing evidence offered by Drs. Ham and Becker suggested that Philipp's brain damage occurred during hospitalization, the prosecutor referred to that evidence in her argument as if it established that *Julie* had

---

[26] *See generally* Exhibit 1.
[27] Exhibit 15.

injured Philipp.[28]  In addition, although the prosecutor confirmed in her closing argument that this was a "blunt trauma" case, not a "shaken baby" case,[29] the prosecution's lead witness, Dr. Becker, diagnosed shaking as the cause of the brain damage,[30] and the prosecutor insisted, incorrectly, that these very different allegations are "grouped together" and that "we're talking about the same thing."[31]  Given the repeated references to "shaking," it is virtually inevitable that the jury would have confused the charges with "shaken baby syndrome," a prejudicial and controversial diagnosis that has garnered widespread attention in the media and inevitably inflames popular outrage against abusive parents.  Finally, there is some possibility that the State was well aware of the inconsistencies in its theories and that potentially exculpatory information may not have been provided to the defense.[32]  These claims require further investigation, particularly in view of the medical reports confirming that Philipp's brain damage was natural, rather than traumatic, in origin.

## V. CONCLUSION

For the reasons stated above, Ms. Baumer respectfully requests that this Court grant her Application and enter an order requiring her release from the Michigan Department of Corrections

---

[28] Since this case involved technical medical evidence, the jury asked for a transcript of the testimony, which was not available.  TR VIII, 4-7.  At the end of the trial, a juror asked the Court whether Ms. Baumer had "really done it," suggesting that the jury was thoroughly confused by the evidence, which was conflicting and incomplete.  TR VIII, 18.  As the appellate brief suggests, this evidence was misinterpreted by appellate counsel even with the benefit of a transcript.  See Exhibit 7 at 21, 22.

[29] TR VII, 42.

[30] TR V, 81.

[31] TR VII, 42.

[32] See Exhibit 10 at ¶ 53.  Mrs. Baumer, Philipp's grandmother, states in her affidavit that on December 18, 2003, the detective in charge of the investigation told her that he was not bringing charges against Julie at that time because of conflicting information from Children's Hospital.  We do not know the information to which he was referring.  In addition, we do not have copies of the labor and delivery records from Philipp's birth, or the laboratory reports from Children's.  These materials may provide additional information on birth injury, illness or infection.

Dated: December 7, 2008

Respectfully submitted,

s/Carl J. Marlinga

Carl Marlinga   P17102
Counsel for Plaintiff
43550 Elizabeth, Suite 300
Clinton Township, MI 48036
(586) 468-1783
mail@marlingalaw.com

S/Charles I. Lugosi

Charles I. Lugosi
Co-Counsel for Plaintiff
Ave Maria School of Law
3475 Plymouth Road
Ann Arbor, MI 48105
(734) 827-8031